No. 3260

Second Circuit

SMITH v. HAAS

(June 28, 1928. Opinion and Decree.)
(November 8, 1928. Rehearing Refused.)

Barksdale, Bullock, Warren, Clark and Van Hook, of Shreveport; Porterie, Bordelon and Roy, of Marksville, attorneys for plaintiff, appellant.

Overton and Hunter, of Alexandria; W. E. Couvillion, and Bordelon and Normand, of Marksville, attorneys for defendant, appellee.

## STATEMENT OF THE CASE

REYNOLDS, J. This is a suit by Mrs. Theodosia Self Smith, widow of Robert Hill Smith, in her own behalf and also on behalf of her minor child, Robert Hill Smith, of whom she is the duly confirmed and qualified natural tutrix, against W. D. Haas, to recover damages alleged to have been sustained by them in the death of Robert Hill Smith, who was slain by the defendant, W. D. Haas.

She alleges that the said W. D. Haas did wilfully, feloniously and with malice aforethought kill and murder the deceased.

The defendant filed an exception of no cause of action, which, however, appears not to have been passed on.

Defendant also filed an answer setting up:

" * * * that on December 20, 1926, respondent, as president of the Union Oil Company, Inc., superinduced thereto solely by business reasons and in the interest of said company, and for causes deemed sufficient by respondent, requested the said

Smith to resign as manager of said company, and, upon the refusal of the said Smith to do so, respondent proceeded to issue a call for a meeting of the board of directors of said company to act upon said subject matter; that, thereupon, the said Smith, unjustly infuriated by respondent's request and action, and in desperate mood born of his financial difficulties and embarrassment, proceeded to vituperate your respondent, and to declare his intentiion of killing your respondent, paying no heed to respondent's remonstrances, and refusing to listen to reascn; that, finally, the said Smith, with a reiteration of his threat against respondent's life, undertook to carry his threat into execution by reaching for a loaded revolver lying in an open drawer immediately in front of and within the easy grasp of the said Smith, with the manifest purpose of· then and there taking the life of your respondent; that, thereupon, your respondent beholding his life in imminent danger, and acting solely in self defense, quickly drew a pistol and fired rapidly twice at the said Smith, inflicting a mortal wound upon the said Smith when and while the said Smith was continuing in the act of undertaking to slay your respondent. "That, as aforesaid, respondent acted solely in defense of his life and person in taking the life of the said Smith; that, at the time respondent fired the fatal shot, said Smith had formed and expressed the design of taking your respondent's life, was committing an assault upon respondent, and was undertaking then and there to execute said design with the means at hand and opportunity so to do; that the said Smith, and not respondent, was the aggressor; that respondent could not have safely retreated when and while the said Smith was making said assault upon him; that when ·respondent fired, as aforesaid, he was acting under the real and honest belief, and had reasonable grounds to believe, that he was in imminent danger of his life being taken, or of great bodily harm being inflicted upon him by the said Smith; and that said homicide was both justifiable."

A jury was prayed for by defendant and ordered by the Court and on these issues the case was tried before the Court and jury. The jury returned a verdict: "We, the jury, find for the defendant, Dr. Haas, rejecting the demands of the plaintiff; 10 in favor of defendant, 2 in favor of plaintiff."

Upon this verdict a judgment was rendered and signed by the Court rejecting plaintiff's demands and dismissing her suit at her cost, and she has appealed.

Defendant has filed in this court an exception of no cause of action.

## OPINION

## EXCEPTION NO CAUSE OF ACTION

The exception is founded upon the theory that the petition only presents conclusions of law and does not contain averments of facts.

We canot concur in this contention.

Allegation III reads as follows:

"That, on December 20, 1926, at and in the said Parish of Avoyelles, Louisiana, the said W. D. Haas did wilfully, feloniously and with malice aforethought, kill and murder petitioner's said husband."

This language is equivalent, we think, to charging that defendant intentionally slew the deceased and without legal justification or excuse; and such averments, if proved, would have entitled plaintiff to judgment.

## ON THE MERITS

The vital issue in the case is whether the slaying of the deceased was without legal justification or excuse or, as defendant avers, was necessary in defense of his own life.

Defendant was president of the Union Oil Company, Inc., and the deceased the manager of its mill at Bunkie, Louisiana.

The deceased wrote the defendant the following letter.

"Bunkie, La., December 16, 1926.
"Dr. W. D. Haas,
"Bunkie, La.,
"Dear Sir:
"The following entries should be made on the books of the Union Oil Co., Inc., crediting my account as follows:
"Use of auto and expense of operating same 12 mos. @ $50.00 per month____$600.00
"$50.00 per month additional salary 1925-26 _____ 600.00
"5% net profits for year 1925-26 on $12,113.05 _____ 605.65

"Total _____$1805.65
"At the same time I wish to advise that I shall expect the same salary to be paid me for the season of 1926-27.
"I have pointed out to you that the above was nothing but fair and equitable. I have also made it a point to learn the salaries being paid to managers at other mills. The above is less than is being paid to mill managers of the same class and investment.
"Yours Very Truly,
(Signed) "Hill Smith."

This letter is imperious and indicates a determination on the part of the deceased to exact of the company of which defendant was president credits that were not conceded him and to fix his own salary for the current business-year; and while it would not have justified violence on the part of defendant, it did warrant him in saying to deceased, as he did,

"If you feel that way, if that is your attitude, you should resign."

The deceased refused to resign, whereupon defendant told him that he would call a meeting of the board of directors of the company and present the matter to them.

At this point first arose the probability that deceased would resort to violence toward defendant or words were used by deceased indicating an intention to provoke a personal encounter between him and defendant.

A. A. Keller, a witness on behalf of plaintiff, testified:

"Q. What was Mr. Hill Smith's position as relates to the desk at which he was sitting, was it toward the desk or toward Dr. Haas? In what direction was he facing to the best of your recollection?
"A. * * * I paid no particular attention to them other than seeing them in there. I thought they were having some sort of a meeting in there until after awhile a little argument started up and I heard Mr. Smith, 'Doctor, you didn't treat me right'; and there is where I began to pay some attention to the argument.
* * * *
"Q. Just tell the jury in your own narrative way the scene that you saw and the conversation that you heard between them.
"A. Well, when Dr. Haas spoke to Hill and told him about carrying him all through these hard times he finally said, 'Well, we can settle that matter right now.'
"Q. Who said that?
"A. Dr. Haas said, 'We can settle the matter right now.' And Hill Smith turned around and said, 'Well, I am unarmed, and I know that you always pack a gun.' And then Dave spoke up and said,—no, there was something else before that. Doctor said something about wanting Hill's resignation, and Hill spoke up and said, 'Well, I am not going to resign,' and the Doctor said, 'Well, I am going to call a meeting of the board of directors and force your resignation,' and Hill spoke up and said, 'Well, if you do, I will make it hot for you.' And about the time he said that, then Dave spoke up and said, 'Hill, you and I have been friends a long time, but,' he said, 'You have threatened his life, and I will make it a personal matter between you and I.' And I said, 'This is no place for me,' and I left.
* * * *
"Q. Now, what was the first thing that you heard?
"A. The first thing that I remember of

the conversation between Hill and Dr. Haas was that Hill said, 'Doctor, you haven't treated me right.' That is when I first taken notice.

\* \* \* \*

"Q. Now, when the Doctor said he was going to call a meeting the board of directors and, as you expressed it, force his resignation, what did Hill Smith then say to the Doctor?

"A. He said, 'If you do, I will make it hot for you.'

\* \* \* \*

"Q. Now, when Dave Haas spoke to Hill Smith he used the expression, 'You have threatened my fathers' life' Did he not?

"A. He did use that expression.

"Q. 'You have threatened my father's life'?

"A. I don't know whether he said 'my father' or pointed to him.

\* \* \* \*

"Q. Did Hill Smith deny that he had threatened his life?

"A. He didn't say a word to Dave, but turned aroun l on his stool and looked at him straight in the face. I don't know now whether he answered him or not. Right at that time I left the office.

\* \* \* \*

"Q. Well, didn't he say something about 'Young man, you have made an awful threat.'

"A. Yes, sir, he said, 'You have made an awful threat.'

"Q. Dr. Haas told Hill Smith that?

"A. Yes, sir.

\* \* \* \*

"Q. Therefore, while you were there you heard Dr. Haas say to Hill Smith, 'That is an awful threat you made. young man,' and you heard Dave Haas say to Hill Smith, 'You have threatened his life,' meaning his father?

"A. Yes, sir.

"Q. And Hill Smith did not say he had not?

"A. He didn't say a word, just looked at him."

Alvin Martin, a witness on behalf of plaintiff, testified:

"Q. Did you hear any conversation between them?

"A. When I went in, Dr. Haas and Mr. Hill were talking. I do not know what they were talking about. I heard Mr. Hill say, 'You have not treated me right.' "

This testimony of these two witnesses considered in connection with deceased's letter to defendant, shows an intention on the part of deceased to compel acceptance by defendant of his demands, and corroborates the testimony of defendant and his witnesses that defendant killed deceased necessarily in defense of his own life.

The defendant, W. D. Haas, testified:

"I went into the office for the purpose of having some letters written calling a meeting of the board of directors. As I walked in I saw Mr. Mikell and Mr. Smith. I spoke to them, said 'Good evening,' and as the purpose of my calling the board together was predicated on a letter I had had from Mr. Smith, I walked up to him and spoke to him. I said, 'Hill, I received your letter this morning. I am surprised and disappointed that you should write me a letter like that. If you feel that way, if that is your attitude, you should resign.' 'Well,' he said, 'will not.' I said, 'Very well, if you will not resign, I will call the board together and lay the matter before them.' 'Then,' he said, 'if you do that, you have got to kill me or I will kill you.'

\* \* \* \*

"I don't know how long we had been there but I hadn't said anything more to him nor had he said anything more to me. Then a man walked in from behind me, walked in front of me, pulled the drawer open and put a pistol in the drawer, gave it a shove to—didn't push it to, and then turned around and walked out or went out. For a moment I couldn't realize just what it was and I stood there for a second. This was a serious situation, gentlemen, as I realized it. The man had threatened my life and was sitting there with a pistol in his reach. Then I spoke up, and I said, 'Hill, you have threatened my life,' and before I could finish the sentence he said, 'Yes, and I mean it.'

"Q. How did he reach for the pistol?

"A. With his right hand. In reaching for it he moved himself off the stool as he reached.

"Q. I was just going to ask you did he remain seated?

"A. He moved off the stool as he reached out but he was as close to the drawer as I was anyway.

"Q. Then you were saying to him, 'Hill, you have threatened my life,' and before you could get any further he said, 'Yes, and I mean it?'

"A. He did.

"Q. And then what was his movement first relative to the stool?

"A. He moved off the stool and ʟrabbed for the pistol.

"Q. With his right hand reaching for that pistol into the drawer?

"A. Yes, sʻr.

"Q. And you shot him?

"A. I shot him.

"Q. Where did you have your ɡun?

"A. In my hip pocket."

Dave Haas testified:

"Q. Now, when you got into the office, following your father, did you hear anything said, and if so, what did you hear?

"A. I heard the Doctor say, 'Hill, I received your letter. I am surprised and disappointed.'

"Q. Did Smith make any reply then and there to that remark?

"A. No, sir.

"Q. What was next said, and by whom?

"A. The Doctor said, 'I want your resignation. We cannot go on in business like this.'

"Q. Did Smith make any reply to that?

"A. He said he would not give it.

"Q. Then what was said after he said he would not give it?

"A. The Doctor said he would call a meeting of the board of directors and ask for his resignation.

"Q. What reply, if any, did Smith make to that remark?

"A. Smith said, 'If you do I will kill you or you will have to kill me.'

"Q. Please state how he said that?

"A. Very emphatically.

"Q. Did the Doctor make any reply to that threat?

"A. He did.

"Q. What did the Doctor say?

"A. He said, 'Young man, do you realize what a serious threat you have made?' Smith said, 'Yes, and I mean every word of it.'

"Q. What did the Doctor say to that?

"A. He said 'All right, we will settle it right now.'

"Q. Then what did Hill say?

"A. He said he was unarmed.

\*     \*     \*     \*

"Q. Now, did you and Mikell proceed to seal the letters?

"A. We did. That is, he signed them and I sealed most of them as he would sign them. I would fold them and put them in the envelope and seal them as he signed them, the most of them.

"Q. Well, how long did that take you, about?

"A. About a minute.

"Q. Now, did anything happen as you were finishing the last letter? Or about that time?

"A. As I sealed the last letter, I heard the Doctor say, 'Hill, you have threatened my life'; Hill said, 'Yes, and I mean it.' I turned quickly, saw Hill off the stool with his right hand in the drawer where the pistol was, heard two shots in rapid succession, and saw Hill fall, striking the adding machine, knocking it down to the floor.

"Q. Now, at the time you heard the Doctor say, 'Hill, you have threatened my life,' and Hill's statement, 'Yes, and I mean it'—at that time you had your back to both of them.

"A. Yes, sir.

"Q. Now, I believe you stated that you immediately turned around?

"A. I did.

"Q. Did you turn quickly?

"A. Yes, sir.

"Q. And as you did so, you saw what?

"A. I saw Hill off the stool with his right hand in the drawer where the pistol was.

"Q. Then two shots were fired?

"A. Yes, sir."

Under this testimony there is no escape from the conclusion that the deceased, at the time he was shot, was reaching to grasp a loaded pistol nearby for the purpose and with the intention of attempting

to take the life of defendant with it and that it was necessary for defendant to shoot him to prevent him from accomplishing his purpose.

Plaintiff insists that the testimony of defendant and his son, Dave Haas, is unreasonable and unworthy of credit. We are unable to take that view of it. Their veracity was not impeached nor was it weakened on cross-examination or otherwise discredited. Neither is it inherently improbable, and in the absence of sufficient reason for disbelieving it we are bound to give it credence. Witnesses testified that defendant was a truthful, law abiding honorable man, and we can imagine no reason why he should have killed the deceased, except it was to prevent the deceased from killing him, and no sufficient other reason is suggested by plaintiff. There is no proof in the record that defendant entertained any ill feeling toward the deceased. On the contrary, it appears therefrom that defendant and deceased were good friends. The deceased owed his position as manager of the mill to defendant's good will and as president of a local bank defendant had been instrumental in procuring loans of money by it to deceased.

The finding of fact by a jury is entitled to great weight and should not be set aside unless manifestly erroneous. We have read the record carefully and cannot say that it does not support the jury's findings.

But plaintiff insists that he was prejudiced in the composition of the jury, and complains that B. P. Dupuy, Henry W. Frith and F. C. Fullilove were tendered her as competent jurors, that they were incompetent, that she objected to them on that ground, that her objection was overruled and she was compelled to exhaust on them her right of peremptory challenge to exclude them from the jury.

We find ourselves unable to consider the question presented owing to the fact that it does not appear from a bill of exceptions.

"If one of the parties call on the court to express an opinion on the point of law arising in the cause, such opinion may ᵇe excepted to."

Code of Practice, Article 487.

"The party excepting to the opinion of the court must draw a bill of exceptions, in which the question of fact or law, on which such opinion has been demanded, shall be concisely set forth, as well as the grounds of the exception so taken * * * "

Code of Practice, Article 488.

"This bill of exception must be exhibited to the adverse party, who may object to any error in the statement therein contained; it shall then be presented to the court, who, after correcting it, if erroneous, shall sign the same, and direct the clerk of file it among the records of the suit."

Code of Practice, Article 489.

But even if the question was properly presented, we are unable to see how plaintiff was prejudiced by being compelled to exhaust her right of peremptory challenge in order to exclude the persons named from the jury, unless it appeared that she objected to at least one person thereafter tendered her as a juror, on the ground of incompetency, and her challenge was overruled, and we do not understand plaintiff to contend that any juror subsequently accepted was challenged by her for cause.

We find no error in the judgment appealed from and accordingly it is affirmed.